# EXHIBIT B-9

**CAUSE NO. 2024-CI-20152**

| | | |
|---|---|---|
| JOHN DUDEK and SARAH DUDEK, | § | IN THE DISTRICT COURT |
| Each Individually, and as Next Friends | § | |
| of P.D. and A.D., Minors; JACOB | § | |
| ESPINOSA and MEGAN ESPINOSA, | § | |
| Each Individually, and as Next Friends | § | |
| of I.R.P. and H.A.E., Minors; JENNIFER | § | |
| NORIEGA, Individually, and as Next | § | |
| Friend of P.N., Minor; JOHN | § | |
| BLUMENFELD; DAISY SOLIZ; RAFAEL | § | |
| MARRERO; ANDREW HILL as NEXT | § | |
| FRIEND of A.H., Minor; and JOSEPH | § | |
| WITZ and ANNA WITZ, Each | § | |
| Individually, and as Next Friends of A.B., | § | |
| J.W.J. and J.W., Minors; BETHANY | § | |
| JOHNSON and LAVELL JOHNSON, | § | |
| Each Individually, and as Next Friends | § | |
| of G.J.and L.J., Minors: | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| VS. | § | BEXAR COUNTY, TEXAS |
| | § | |
| BALFOUR BEATTY COMMUNITIES | § | |
| LLC; FORT BLISS/WHITE SANDS | § | |
| MISSILE RANGE HOUSING LP d/b/a | § | |
| FORT BLISS FAMILY HOMES; | § | |
| LACKLAND FAMILY HOUSING, LLC | § | |
| d/b/a LACKLAND FAMILY HOMES; | § | |
| BBC MILITARY HOUSING BLISS/ | § | |
| WSMR GENERAL PARTNER LLC; | § | |
| BALFOUR BEATTY MILITARY | § | |
| HOUSING MANAGEMENT, LLC; and | § | |
| BBC AF MANAGEMENT | § | |
| /DEVELOPMENT, LLC; SONIA | § | |
| MARANON; and GREG MEINERT | § | |
| | § | |
| *Defendants.* | § | 73RD JUDICIAL DISTRICT COURT |

---

**PLAINTIFFS' FIRST AMENDED PETITION**

---

Plaintiffs JOHN DUDEK and SARAH DUDEK, Each Individually, and as Next Friends of P.D. and A.D., Minors; JACOB ESPINOSA and MEGAN ESPINOSA, Each Individually, and as Next Friends of I.R.P. and H.A.E., Minors; JENNIFER NORIEGA, Individually, and as Next Friend of P.N., Minor; JOHN BLUMENFELD; DAISY SOLIZ; RAFAEL MARRERO; ANDREW HILL as NEXT FRIEND of A.H., Minor; and JOSEPH WITZ and ANNA WITZ, Each Indivudally, and as Next Friends of A.B., J.W.J., and J.W., Minors; BETHANY JOHNSON and LAVELL JOHNSON, Each Individually, and as Next Friends of G.J.and L.J., Minors, (collectively, "Servicemembers," "Servicemember Plaintiffs," or "Families"), bring this Original Petition and Demand for Jury Trial against the Defendants BALFOUR BEATTY COMMUNITIES LLC; FORT BLISS/WHITE SANDS MISSLE RANGE HOUSING LP d/b/a FORT BLISS FAMILY HOMES; LACKLAND FAMILY HOUSING, LLC d/b/a LACKLAND FAMILY HOMES; BBC MILITARY HOUSING BLISS/WSMR GENERAL PARTNER LLC; BALFOUR BEATTY MILITARY HOUSING MANAGEMENT, LLC; BBC AF MANAGEMENT/DEVELOPMENT, LLC; SONIA MARANON, OPERATIONS DIRECTOR, and GREG MEINERT, FACILITIES DIRECTOR (collectively, "Landlord Companies" or "Balfour Beatty"). In support thereof, Plaintiffs would respectfully show the Court as follows:

## I.    NATURE OF THE ACTION

1.    This lawsuit is brought by members of the United States Military (with their families) who leased military housing from the Landlord Companies at Fort Bliss and Lackland Air Force Base ("Military Installation(s)").

2.    As further described below, the Landlord Companies are large, revenue-rich housing companies which were awarded contracts by the federal government to provide quality

living arrangements for U.S. service members and their families. They receive vast amounts of taxpayer revenue and turn massive profits in purporting to do so.

3.      Instead of providing satisfactory housing, the Landlord Companies have for many years concealed harmful housing conditions from unsuspecting military personnel and their families. The personnel who lease the housing units effectively give up the full amount of their Basic Allowance for Housing ("BAH"), only to be placed in housing replete with deplorable living conditions (including, without limitation, leaking pipes, seeping sewage, excessive moisture, repulsive rodent and insect infestations, and systemically-poor maintenance) and appalling defects (including, without limitation, the presence of structurally-deficient flooring and walls, faulty insulation, pervasive mold and other toxins, inescapable contamination due to the presence of asbestos and lead-based paint, deficient electrical, plumbing and HVAC systems, and other unacceptable departures from applicable building and housing codes). In the process, many such military personnel, spouses, and children suffer from ongoing medical issues, such as difficulty breathing, asthma, pneumonia infections, migraines, serious allergic reactions, nose bleeds, and respiratory issues.

4.      As they observe their families get sicker and sicker, and realize the Landlord Companies take no action or grossly inadequate action, they suffer severe and ongoing mental anguish.

5.      When problems with housing begin arising after the military personnel and their families move into the Landlord Companies' homes, the Landlord Companies ignore their residents' complaints or provide only token repairs to cover up the extent of the dilapidation. Thus, the military personnel and their families find themselves in a time-consuming and taxing cycle in which they: (1) must wait on the Landlord Companies to slowly perform maintenance and repairs;

(2) come to falsely believe the issues are resolved; and (3) later discover the issues are not resolved. All the while, the military personnel and their families suffer the consequences of their contaminated and appalling surroundings.

6.    The Landlord Companies routinely over-promise and under-deliver while benefitting from the fact that, in many instances, they falsely appear to act as if they are the Department of Defense or are under the immediate direction of the Department of Defense. Thus, military personnel and their families trust the Landlord Companies, the Landlord Companies know it, and the Landlord Companies take full advantage by maximizing their profits to the detriment of the military families they have been entrusted by the government to properly care for.

7.    Servicemember Plaintiffs in this case assert various claims, including without limitation claims for breach of contract; third-party beneficiary of contract; breaches of the implied warranty of habitability and the implied warranty of good and workmanlike repairs; violations of section 92.051 *et seq.* of the Texas Property Code, the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"); negligence and gross negligence; negligent misrepresentation; statutory fraud and common law fraud; unjust enrichment, restitution, money had and received; and claims for intentional nuisance, negligent nuisance, and strict liability nuisance.

8.    By this lawsuit, the Servicemembers seek to hold the Landlord Companies, Including their agents named herein, liable for their false promises, atrocious living conditions, personal injuries, and property damages caused by the Landlord Companies' profound neglect, malfeasance, and greed.

## II.    PARTIES

9.    The Servicemember Plaintiffs are military families that have lived in or currently live in privatized housing at Military Installation(s) in Texas, making them residents of the State of Texas.

10.    Defendant Balfour Beatty Communities, LLC is a foreign limited liability company organized under the laws of Delaware, with its principal place of business located at 1 Country View Rd., Malvern, Pennsylvania 19355.  It has answered herein and may be served through Its counsel of record.

11.    Defendant Lackland Family Housing, LLC d/b/a Lackland Family Homes, is a foreign limited liability company organized under the laws of Delaware, with its principal place of business located at 2254 Brian McElroy Drive, San Antonio, Texas 78236.  It has answered herein and may be served through Its counsel of record.

12.    Defendant Fort Bliss/White Sands Missile Range Housing LP d/b/a Fort Bliss Family Homes is a foreign limited partnership organized under the laws of Delaware, with its principal place of business located at 1991 Marshall Road, El Paso, Texas 79906.   It has answered herein and may be served through Its counsel of record.

13.    Defendant BBC Military Housing - Bliss/WSMR General Partner LLC is a foreign limited liability company organized under the laws of Delaware, with its principal place of business located at 1 Country View Rd., Malvern, Pennsylvania 19355. It has answered herein and may be served through Its counsel of record.

14.    Defendant Balfour Beatty Military Housing Management, LLC is a foreign limited liability company organized under the laws of Delaware, with its principal place of business

located at 1 Country View Rd., Malvern, Pennsylvania 19355. It has answered herein and may be served through Its counsel of record.

15.    Defendant BBC AF Management/Development, LLC is a foreign limited liability company organized under the laws of Delaware, with its principal place of business at 10 Campus Blvd., Newton Square, Pennsylvania 19073. It has answered herein and may be served through Its counsel of record.

16.    Defendant Sonia Maranon is the Operations Director for Lackland Family Homes and is a resident of the State of Texas. She has answered herein and may be served through her counsel of record.

17.    Defendant Greg Meinert is the Facilities Director for Lackland Family Homes and is a resident of the State of Texas. He has answered herein and may be served through his counsel of record.

18.    Defendants Maranon and Meinert are sometimes referred to herein by their last names, the term "Defendants" refers to each of the Defendants, Individually, and the term "Landlord Companies" refers to all defendants, Including Maranon and Meinert, collectively.

19.    The Landlord Companies and their Defendants are each joint tortfeasors, agents of the others, joint venturers, and/or engaged in the joint enterprise of leasing military housing at the Military Installation(s), as well as the conduct and acts and/or omissions alleged herein. At all times relevant herein, there has existed a unity of interest and ownership among the Landlord Companies, their predecessors, agents, parents and/or subsidiaries, such that any individuality and/or separateness among them has ceased, and each such entity is the alter ego of each other entity.

20.    The Landlord Companies are not persons acting under a federal officer.

### III.    JURISDICTION AND VENUE

21.    The Servicemembers reallege the above paragraphs as if fully restated herein.

22.    This Court has jurisdiction because the amount in controversy is within the jurisdictional limits of the Court. As to the Military Installations at issue, the State of Texas retains concurrent jurisdiction as to some, if not all, of the Military Installations.

23.    Venue is property in Bexar County, Texas pursuant to section 15.002(a) of the Texas Civil Practice and Remedies Code, as it is the county in which a substantial part of the events or omission giving rise to the claims occurred, and because it is the county of at least one Defendant's residence ath the time the cause of action accrued. Pursuant to section 15.005 of the Texas Civil Practice and Remedies Code, because venue is proper as to at least one defendant, it is proper as to all defendants.

24.    Plaintiffs seek monetary relief over $1,000,000.00 and non-monetary relief. Plaintiffs further seek all other relief to which they may be entitled, including common law and statutory damages and reasonable and necessary attorneys' fees and costs, which may cause the relief obtained to exceed this estimate by the time of trial.

25.    This Court has personal jurisdiction over the Landlord Companies because they have committed the acts complained of herein in the State of Texas, including in Bexar County and El Paso Counties. This Court has personal jurisdiction over the Landlord Companies for the additional reason that they have engaged in substantial, systematic, and continuous contacts with the State of Texas by, inter alia, regularly conducting and soliciting business in the State of Texas, deriving substantial revenue from services provided to persons in the State of Texas.

## IV.    FACTUAL ALLEGATIONS

### The MHPI and the History of Privatized Military Housing

26.    Congress established the Military Housing Privatization Initiative ("MHPI") through the 1996 Defense Authorization Act to improve the quality of housing conditions for active-duty military personnel. *See* Pub. L. 104-106, 110 Stat. 186, 544, 10 U.S.C. § 2871 *et seq.* (1996). The MHPI provided military service branches with alternative authorities for construction, renovation, and management of military housing for families and unaccompanied personnel. Under these authorities, the military services can leverage appropriated housing construction funds and government-owned assets to attract private capital and private developers so as to improve the quality of life for military members and their families. This legislation provided a way to maximize use of limited appropriated funds, land, and existing facilities to encourage private sector investment for the benefit of U.S. servicemembers.

27.    Pursuant to the MHPI, the military was encouraged "to stimulate private sector financing of military housing construction and revitalization projects." S. Rep. No. 104-112 (1995).

28.    The MHPI provides the Department of Defense ("DOD") with twelve alternative authorities or tools to achieve its purposes, including the authorization of direct loans and loan guarantees, differential payments to supplement service members' housing allowances, investments such as limited partnerships, stock/bond ownership, and limited liability companies, and the conveyance or lease of military housing units to the contractor.

29.    There are about eighty privatized areas encompassing more than 204,000 housing units located on more than 150 installations. The DOD considers these housing units to be private housing.

---

30.     Servicemembers who lease housing on a particular military base are required to pay the privatized housing company the full amount of their BAH regardless of the size or condition of the house. Before the MHPI, housing was provided to military personnel in lieu of the BAH. This change created continuous revenue flow for the life of the management contract and, at least conceptually, requires little additional funding from the government.

31.     The privatized housing companies collect "rent" in the form of BAH payments directly from the DOD, leaving servicemembers,—including the Servicemember Plaintiffs in this lawsuit—with no control over their BAH and no leverage against the Landlord Companies when problems arise with their homes. This disparity in bargaining power is further exacerbated by the fact that the Landlord Companies have a direct line of communication with the military and are keenly aware that a single call to the Servicemembers' chain of command will likely stifle any complaints about their housing. Consequently, the Landlord Companies often prey on the Servicemembers' fears of reprisal even when conditions within the rental homes merit no BAH payment whatsoever.

32.     Privatizing U.S. military housing was supposed to *protect* soldiers and their families. The military knew hazards lurked in its housing, and the Landlord Companies likewise were aware of the problems when they took over the housing. For example, in 2005, the U.S. Army released an environmental study showing 75% of its 90,000 homes nationwide did not meet its own standards of quality or safety. In 2016, twenty years after privatization, a DOD Inspector General Report found that poor maintenance and oversight left military families vulnerable to "pervasive" health and safety hazards.

**Rampant Abuses of the MHPI**

33.     Beginning in 2018, Reuters published a series of news articles detailing substandard living conditions at U.S. military bases around the country, including lead exposure, vermin infestation, mold and other contaminants. The reports described how military families encounter high hurdles to resolving disputes in a system that grants vast power to private landlords who manage base housing across the United States, as well as a culture of corruption in the privatized military housing industry.

34.     Examples of such articles are included below:





35.     In November 2018, the investigative arm of Congress launched an inquiry into hazards faced by occupants of housing on U.S. military bases and the oversight of those conditions by the armed services.

36.     On December 3, 2019, a hearing was held before the United States Senate's Armed Services Committee. At the outset of the hearing, Senator Jim Inhofe stated as follows:

> Almost a year ago, **I first heard from military families about the dismal conditions they faced**. Frankly, if confession is good for the soul, Janet Driver called this to my attention from Tinker Air Force Base. And I thought this was something that was just unique to Tinker Air Force Base, and then I thought no. It is elsewhere in Oklahoma. But then it is also **all the way around the country**. And so that was the background of how this all started.
>
> We have come to learn that **it is a problem nationwide**. It is **a national crisis** of proportions we have not seen since the scandal at Walter Reed about a decade ago.

*See* STATEMENT BEFORE SENATE ARMED SERVICES COMMITTEE (emphasis added).[1]

37.     Senator Inhofe further added:

> We continue to hear regularly from the **families across the country** about questionable practices, poor workmanship, and frankly, in some places about **housing contractors just not caring** about the families they are supposed to be serving.
>
> Additionally, as reported in the press, some of these contractors are now under investigation for **defrauding the Federal Government**. I am really worried. What else can come out of the woodwork on this? What else don't we know?
>
> . . . .
>
> Regardless of any potential criminal wrongdoing, we are still **receiving complaints on a daily basis** showing that you are still failing to fix this problem.

---

[1] Inhofe's statement can be viewed at https://www.inhofe.senate.gov/newsroom/press-releases/icymi-inhofe-delivers-opening-remarks-at-privatized-military-housing-hearing.

*Id.* (emphasis added).

38.    During the same Senate hearing, Elizabeth A. Field, a Director with the Government Accountability Office, testified:

> We analyzed over 8 million work order records from all 14 private partners and all 79 projects      we found **anomalies in the data provided by all 14 private partners** such as duplicate work orders and work orders with completion dates prior to when they were submitted.

*See* TESTIMONY BEFORE SENATE ARMED SERVICES COMMITTEE at 14:10-14:20 (emphasis added).[2]

39.    Field then added:

> **The problems I detail are significant**      because the Department has been using these metrics to reward and incentivize the private partners.

*See id.* (emphasis added).

40.    Upon information and belief, private military housing companies—including the Landlord Companies—manipulated service and repair records to the detriment of residents to drive up profits, including "incentive fees" that could be collected as part of their contracts with the government.

41.    On February 6, 2019, Senator Elizabeth Warren opened her own investigation of the MHPI and private military housing landlord companies operating thereunder. In Senate testimony on February 13, 2019, John Ehle, President of Balfour Beatty Military Communities, acknowledged Defendants and/or related entities are responsible for the maintenance of the military housing on applicable bases and effectively admitted under oath that they have not met their obligations to ensure the military housing under their charge are safe, clean and habitable. *See, e.g.,* TESTIMONY BEFORE JOINT SUBCOMMITTEE ON PERSONNEL & READINESS AND

---

[2] Ms. Fields' testimony is available at https://www.c-span.org/video/?466935-1/privatized-military-housing.

MANAGEMENT SUPPORT at 2:21:20-2:21:26.[3] The leaders of other housing entities operating under the MHPI echoed the same with respect to their standards and procedures and, as a result, amplified widespread concern about a culture of systemic abuse that appears to be rampant throughout the housing companies operating under the MHPI (including the Landlord Companies named as Defendants herein). *See id.*

42.    The Landlord Companies were tasked with providing quality military housing to U.S. military personnel and their families but, upon information and belief, the Landlord Companies have operated duplicitously, so as to avoid doing so, and thereby decrease costs while increasing profits at the expense of U.S. soldiers, their families, and the United States taxpayer.

43.    Senator Warren submitted her written report, dated April 30, 2019, which contained four conclusions about the various private housing firms operating under the MHPI, including the Landlord Companies named as Defendants herein: (1) they have set up a complicated web of subcontractors and subsidiaries that undermines accountability for substandard conditions in military housing and makes it difficult to track revenues, profits, and the flow of funds; (2) they have failed to create accessible or centralized records and protocols to address complaints and reports of problems with military housing, which makes comprehensive assessment and oversight of their performance difficult and complicates efforts to improve housing quality; (3) they are making large profits while taking minimal investment risks; and (4) they are receiving sizeable incentive fees even when they face substantial quality control challenges. *See* REPORT OF

---

[3] The hearing testimony is available at https://www.armed-services.senate.gov/hearings/19-02-13-current-condition-of-the-military-housing-privatization-initiative.

INVESTIGATION INTO MHPI, Apr. 30, 2019.[4] *Despite the Congressional oversight, as demonstrated herein, the same conditions and practices persist.*

44.    Since having ownership of the subject housing units at the Military Installation(s) transferred to them and being delegated maintenance responsibility for the same, the Landlord Companies have systematically undermaintained the units, subjecting the Servicemembers and their families to the above-described atrocious conditions.

45.    In their dealings with the Servicemembers, but for the admissions and acknowledgements in their congressional testimony, the Landlord Companies refuse to acknowledge the severity of the problems and refuse to adequately remedy them, instead moving families over and over again to new units they assure the Servicemembers are just fine.

46.    As a result, the Servicemembers and their families have fallen ill due to exposure to the mold and other toxins, lost nearly all their personal possessions (some as a result of living in multiple units with environmental issues), and paid the Landlord Companies their full BAH in exchange for woefully substandard facilities.

### The Servicemembers and their Families Have Suffered Tremendously

I.    **The Dudek Family**

47.    John Dudek, his wife, Sarah Dudek, and their two children moved to Balfour Beatty-managed on-base housing located at 3317 Kerfoot Street, Unit B, El Paso, Texas 79904 on December 16, 2021. Shortly after the Dudek family moved in, they began to encounter issues related to mold and water damage.

---

[4] Senator Warren's report is available at
https://www.warren.senate.gov/imo/media/doc/2019.04.30%20Military%20Housing%20Letter%20to%20Armed%20Services%20Branch%20Chiefs.pdf.

48.     Despite being aware of mold and water damage at the houses at Fort Bliss, the Landlord Companies leased the house to the Dudek family without revealing the profound defects and safety risks associated with the houses. The Dudek family relied to their detriment on the Landlord Companies' materially false and misleading representations that their houses were safe, habitable, and adequately repaired. Balfour Beatty continued to mislead the Dudek family by representing that the Landlord Companies were performing adequate repairs when they were not. Shortly after moving in, the Dudeks noticed water damage in the kitchen and dining room. After several attempts to address the issue, Balfour Beatty finally took steps to remediate the damage. After being temporarily displaced, The Dudeks returned to the subject home to find out that a moldy cabinet and damaged flooring remained untouched during the initial remediation. A second attempt at remediation was performed, but it did not fully rectify the issues or fix the household goods that had to be repaired or replaced. The Landlord Companies' repairs were often merely band-aids that concealed larger problems and failed to remedy underlying issues.

49.     Within months of moving into the house, the entire family began suffering from health effects caused by these poor housing conditions. John Dudek has been riddled with upper respiratory issues and sinus infections correlated with mold in the home. Sarah Dudek suffered from similar upper respiratory issues and sinus infections which aggravated her asthma due to the exposure to the mold growing in the home. The children, P.D. and A.D. had sinus and respiratory symptoms. P.D. has experienced several upper respiratory infections since living in the subject home. A.D., as a newborn, was perpetually congested with a cough and runny nose since living in the subject home. Prior to being exposed to the mold inside the home at Fort Bliss, the children were healthy young children. Without question, the Dudek family would never have entered into

a lease with Balfour Beatty had they known at the start that Balfour Beatty was leasing them a house it knew was unsafe.

50.    Because the Landlord Companies concealed the truth about their housing and then failed to remediate problems that materially affected physical health and safety, the Dudek family suffered economic damages consisting of their Basic Allowance for Housing, elevated utility bills, repair bills, medical bills, and personal property damages. They also suffered profound health issues, potential career setbacks, and mental anguish and distress worrying about their children, their health, careers, and how to deal with their contaminated personal property.

## II.    The Espinosa Family

51.    Jacob Espinosa, his wife Megan Espinosa, and their two children moved to Balfour Beatty-managed on-base housing at Lackland Air Force Base located at 2239 Lavene Loop, Lackland, TX 78236 on July 22, 2022. During the time the Espinosa family lived in the home, they experienced—and continue to experience—unhealthy and unlivable conditions including mold, plumbing issues, water damage, and structural defects.

52.    Throughout their tenancy, the Espinosa family was forced to deal with mold, plumbing issues, water damage, and structural defects. Furthermore, although Balfour Beatty attempted remediation and displaced the Espinosa family for a number of months, they forced the Espinosa family to move back into the home *before remediation had been adequately completed.* This was despite the repeated conversations with Balfour Beatty employees, including Maranon and Meinert, wherein Maranon and Meinert represented to the family that remediation had been or would be completed adequately.

53.    Within months of moving into the house the first time, the Espinosa family began suffering from health effects as a result of living in the contaminated house. The mold in the

Espinosa home was so bad that the family was displaced from their home for repairs for over six months. Jacob Espinosa's bronchitis and increased respiratory issues correlated with the mold in the home, resulting in his worsening health problems. Megan Espinosa also suffered from increased migraines after exposure to mold growing in the home. In addition, both of their children, I.E. and H.E., experienced rheumatological dysfunction while living in the home. Both children were healthy young girls prior to being exposed to the mold inside the home at Lackland Air Force Base. All family members were seen by medical professionals after experiencing the above-listed adverse health effects. Nearly immediately after being forced to move back into the house after the failed remediation, these health issues came back. These health problems continue to affect the Espinosa family to this day. Without question, the Espinosa family would never have entered into a lease with Balfour Beatty had they known at the start that Balfour Beatty was leasing them a house it knew was unsafe.

54.      Despite being aware of the persistent safety and health hazards at the houses at Lackland Air Force Base, Balfour Beatty leased the house to the Espinosa family without revealing and concealing the profound defects and safety risks associated with the house. On at least one occasion, Maranon represented to the Espinosa family that they would need to be displaced because of a hot water tank leak in the garage, when she knew or should have known that the reason for their urgent displacement was the mold in the home. Maranon also represented to the Espinosa family that the house was ready for them to move back into, despite not consulting with other Balfour Beatty employees such as Meinert to determine if the house was truly safe to move back into. Similarly, Meinert represented to the Espinosa family on at least one occasion in August of 2024 that water damage in the home would be properly remediated; this was proven to be false when, on at least one occasion in September of 2024, water damage in the home was repaired and

supervised by Balfour Beatty employees who were not qualified to attempt mold remediation. The Espinosa family relied to their detriment on Balfour Beatty's materially false and misleading representations that their house was safe, habitable, and adequately repaired. Again and again, the Espinosa family notified Balfour Beatty of potentially dangerous conditions at their house, to no avail. Balfour Beatty continually assured the Espinosa family that work was performed and that the house was safe when Balfour Beatty knew that was not true.

55.    Because Balfour Beatty concealed the truth about its housing and then failed to remediate problems that materially affected physical health and safety, the Espinosa family suffered economic damages consisting of their Basic Allowance for Housing, elevated utility bills, repair bills, medical bills, and personal property damages. They also suffered profound health issues, potential career setbacks, and mental anguish and distress worrying about their children, their health, careers, dealing with constant displacement, and figuring out how to deal with their contaminated personal property. These are struggles the Espinosa family has to this day.

## III.    The Noriega Family

56.    Jennifer Noriega; her two children, Rafael Marrero and P.N.; Jennifer's boyfriend, John Blumenfeld; Rafael's wife, Daisy Soliz; and Jennifer's niece, A.H. ("the Noriega family") lived in Balfour Beatty-managed on-base housing at Fort Bliss located at 3234 Ruckman Street, Unit A, El Paso, Texas 79904 starting on June 6, 2018. The unhealthy and unlivable conditions they encountered continued to plague them until the day the family left.

57.    Despite being aware of mold, plumbing issues, water damage, asbestos, and structural issues at its houses at Fort Bliss, Balfour Beatty leased the house to the Noriega family concealing and without revealing the profound defects and safety risks associated with the house.

The Noriega family relied to their detriment on Balfour Beatty's materially false and misleading representations that their house was safe, habitable, and adequately repaired.

58.    After the lease was signed, severe problems within the house started to arise. On or about February 23, 2022, the water heater in the subject home exploded after a crew worked on the main line resulting in the air conditioning unit flooding. As a result of the flooding, the excess water caused mold growth in the air ducts and vents. On or about May 4, 2022, P.N. lost his balance while moving furniture and collided with a wall which created a hole, the Noriega family called in the work order that same day. Some 4 months later, the maintenance and repair crew finally came to assess the hole and mold in the home which they indicated needed to be tested for asbestos and mold. The condition of the Noriega home was so bad that the family was displaced from their home for repairs, and yet when they returned, the problems continued.

59.    Throughout their tenancy, Balfour Beatty continued to mislead the Noriega family by representing that Balfour Beatty was performing adequate repairs when Balfour Beatty was not. Balfour Beatty's repairs failed to remedy underlying issues.  The lack of sufficient repairs required the Noriega family to be displaced from their home temporarily. Even after Balfour Beatty claimed that their home was safe to move back into, the issues started back up again immediately.

60.    As a result of the squalid conditions in which the Noriega family was forced to live, their health suffered as well. Jennifer Noriega's labored breathing, chronic congestion, chronic cough, fatigue and migraine issues correlated with the condition of the home, resulting in her worsening health problems including the need of an inhaler. John Blumenfeld also suffered from labored breathing, chronic congestion, chronic cough, fatigue and migraine issues after exposure to the mold growing in the home. Rafael Marrero experienced labored breathing, chronic congestion, chronic cough, fatigue migraines and chronic nose bleeds while in the subject home.

Daisy Soliz experienced similar symptoms as both John Blumenfeld and Jennifer Noriega; additionally, she tragically suffered a miscarriage while in the subject home. The children, P.N. and A.H., had sinus and respiratory related symptoms such as chronic cough, chronic congestion. P.N. also experienced nosebleeds, shortness of breath fatigue and migraines while in the home. Prior to being exposed to the mold inside the home at Fort Bliss, the children were healthy young children. Without question, the Noriega family would never have entered into a lease with Balfour Beatty had they known at the start that Balfour Beatty was leasing them a house it knew was unsafe.

61.    Because Balfour Beatty concealed the truth about its housing and then failed to remediate problems that materially affected physical health and safety, the Noriega family suffered economic damages consisting of their Basic Allowance for Housing, elevated utility bills, repair bills, medical bills, and personal property damages. They also suffered profound health issues, potential career setbacks, and mental anguish and distress worrying about their young family members, their health, careers, and dealing with their contaminated personal property.

## IV.    The Johnson Family

62.    Lavell Johnson, his wife Bethany Johnson, and their two children, moved into the Balfour Beatty-managed property located at 7017 Eastman St., El Paso, Texas 79930 on September 25, 2023. During their time in the home, the Johnson family faced severe problems within the house including an infestation of rodents.

63.    Despite being aware of an infestation of rodents and insects, asbestos, and structural issues at its houses at Fort Bliss, Balfour Beatty leased the house to the Johnson family concealing and without revealing the profound defects and safety risks associated with the house. The Johnson

family relied to their detriment on Balfour Beatty's materially false and misleading representations that their house was safe, habitable, and adequately repaired.

64.    Approximately a week after moving into the subject home, the Johnson family spotted their first mouse, which caused some concern. They notified the Defendants immediately. Later, on or about March 2024, the Johnson family discovered that the mice were so invasive that mice were living in the walls of their home. Even after the Johnson family submitted several work orders and calls, the situation did not improve for approximately 10 months. In the later part of June 2024, the A/C unit was rendered inoperable for several days due to the mice. When maintenance fixed the A/C unit, the unit began circulating the toxic air, composed of mice urine and feces, all around the house which caused L.J. to be rushed to the emergency room. Ultimately, the Johnson family had to move out due to the health and safety risks posed by the feces and urine of the multitude of mice. As a result of the infestation, Bethany experienced reoccurring skin rashes, fainting, the weakening of her immune system and PTSD related to the constant state of worry of the health of her family. Most recently, Bethany was hospitalized due to shortness of breath and contact dermatitis. After being released, her symptoms worsened to the point where she began fainting, causing her to return to the hospital and stay overnight. Lavell suffered from a severe cough that impacted his ability to work, acute bronchitis, and depression due to the mice and their toxic presence in the home. G.J experienced a febrile seizure, constant fever, heavy breathing, and PTSD when getting her diaper changed as a result of the catheter that was placed during hospitalization. L.J. also suffered a febrile seizure, croup and constant fevers due to the toxic air and environment in the home. Bethany and Lavell never had experienced these symptoms and conditions prior to moving into the subject home. Similarly, G.J. and L.J were healthy and happy children before moving into the subject home. Without question, the Johnson family would

never have entered into a lease with Balfour Beatty had they known at the start that Balfour Beatty was leasing them a house it knew was unsafe.

65.     Because Balfour Beatty concealed the truth about its housing and then failed to remediate problems that materially affected physical health and safety, the Johnson family suffered economic damages consisting of their Basic Allowance for Housing, elevated utility bills, repair bills, medical bills, and personal property damages. They also suffered profound health issues, potential career setbacks, and mental anguish and distress worrying about their young family members, their health, careers, and dealing with their contaminated personal property.

## V.      The Witz Family

66.     Joseph Witz, his wife Anna Witz, and their three children, moved into the Balfour Beatty-managed property located at 2240 Scott Sather Dr., Lackland AFB, Texas 78236 on August 19, 2021. During their time in the home, the Witz family faced severe problems within the house including design flaws leading to water damage and mold.

67.     Despite knowing about these issues with the houses at Lackland Air Force Base, Balfour Beatty leased the house to the Witz family without revealing the profound defects and safety risks associated with the house. The Witz family relied to their detriment on Balfour Beatty's materially false and misleading representations that their house was safe, habitable, and adequately repaired. Balfour Beatty, as well as Sonia Maranon and Greg Meinert, continued to mislead the Witz family by representing that Balfour Beatty was performing adequate repairs when, in fact, Balfour Beatty was not. Specifically, in October of 2023, Maranon represented to the Espinosa family the steps for the procedure Balfour Beatty's staff intended to take to protect the family's belongings during their displacement, including covering personal property with commercial grade plastic before opening up the walls, as well as having the cleaning team use specialized

chemicals to treat mold and other related substance. Given the degree to which the family's personal property was contaminated by construction debris and mold during the attempted remediation, and given that the cleaner confirmed that only lemon polish was used during the cleaning process, Maranon made the statement either knowing the statement was false or with reckless disregard for whether or not the statement was false. Similarly, on at least one occasion in June of 2023, Meinert represented to the Witz family that mold found in the bathroom was "inactive" and "not alive." As evidenced by the fact that the mold was indeed active and later required remediation, Meinert made the statement either knowing the statement was false or with reckless disregard for whether or not the statement was false.

68.     Moreover, the Witz family's health suffered as a result of living in the contaminated house. These health problems continue to this day. Anna Witz suffered from hearing loss, numbness, tingling, neuropathy, muscle atrophy, muscle weakness, tremors, musculoskeletal pain, joint pain, cognitive decline, connective tissue disorder, hoarse voice, swallowing difficulty, blurry vision, dry eyes, dry mouth inflammation, malar erythematous rash, loss of heat sensation, and loss of pain sensation. There were all issues which Anna Witz did not have prior to moving into the subject home. A.W., who also never had symptoms prior to moving into the house, experienced renal problems such as hydronephrosis and swelling of renal pelvis with no physical cause, frequent urination, urinary urgency, pain with urination, neurological issues including a diagnoses of "Unspecified Neurocognitive disorder" and "Pediatric Acute Onset Neuropsychiatric Syndrome", changes in emotional regulation, changes in handwriting and reading, joint pain in her legs and hands, hand weakness and hand pain. J.W.J. suffered from drastically worsened headaches and nosebleeds. While J.W.J. had a history of minor headaches and nosebleeds, after living in the home for a couple months, Joseph suffered from heavy nosebleeds and severe

migraines which required multiple trips to the emergency room. J.W., who had eustachian tube dysfunction which had resolved in 2019, struggled with retracted ear drums, hearing loss, and fluid retained in his eardrums within two months of moving into the home in 2021.These issues persisted the entire time the Witz family was in the house, and J.W. now must wear hearing aids even after having undergone two recent surgeries. Without question, the Witz family would never have entered into a lease with Balfour Beatty had they known at the start that Balfour Beatty was leasing to them a house it knew was unsafe.

69.     Because Balfour Beatty concealed the truth about their housing and then failed to remediate problems that materially affected physical health and safety, the Witz family suffered economic damages consisting of their Basic Allowance for Housing, elevated utility bills, repair bills, medical bills, and personal property damage.  The Witz family will likely continue to suffer health issues associated with exposure to mold and other airborne toxins at the Balfour Beatty-managed property.  Additionally, the Witz family suffered mental anguish as a result of Balfour Beatty placing them in an uninhabitable house that made them sick.  The conditions in the home also caused them to suffer mental distress from living in an unhealthy environment, worrying about their family's health, dealing with a landlord that consistently failed to address issues that materially affected their health and safety, and anxiety over how to escape their house without disrupting their lives or incurring tremendous costs from moving, personal property replacement, and off-base housing.

## The Common Theme

70.     On the day each of these Families first saw and leased their respective house from Balfour Beatty, Balfour Beatty's representatives told the Families that the house being leased to them was safe for them to occupy and had no unresolved issues, and each of the families believed such statements to be true. These communications occurred at the Balfour Beatty housing office on the various Military Installations, including Fort Bliss and Lackland Air Force Base. Thereafter, throughout their time in the houses, whenever the Families would call in, email in, or otherwise submit a work order, Balfour Beatty's representatives, as well as the maintenance personnel, would tell the Families—either at the house or at the housing office—that all work necessary to resolve the issue had been performed. These representations were demonstrably false, as the issues complained of continued to persist throughout the Families' occupancy of the house leased to them. Further investigation has revealed that the houses had long-standing maintenance issues. The names, dates, and issues that are the subject of the false representations are documented in the work order histories maintained by the Landlord Companies.

## The Underlying Contracts, Military Services' Standards, and Servicemember Leases

71.     Congress designed the MHPI to "substantially upgrade military housing on an accelerated basis" through the utilization of new "authorities" that permit the military to offer certain cost-saving and money earning benefits to private entities in return for their provision of housing and related services to military personnel. *See* 141 Cong. Rec. S18853 (noting the MHPI provides "new authorities for the provision of new housing, repaired housing, [and] restored housing for our military personnel.").

72.     According to the website for the Office of the Assistant Secretary of Defense for Sustainment, Congress established the MHPI "as a tool to help the military improve the quality of life for its servicemembers by improving the condition of their housing."[5]

73.     After the MHPI was enacted into law, the United States of America—to accomplish its admirable goals related to the improvement and management of military housing—entered into a ground lease and various other contracts (the "Underlying Contracts") binding the Landlord Companies for the design, development, management, operation, maintenance, renovation, and rehabilitation of housing units for military personnel and their families at the Military Installation(s).[6]

74.     Accordingly, military personnel—such as the Servicemember Plaintiffs—were intended beneficiaries of the MHPI and the Underlying Contracts which served as the primary vehicle for implementation of the MHPI. The MHPI and the Underlying Contracts were created for the express purpose of improving military housing for military personnel and their families.

75.     As a result of the Underlying Contracts binding the lessee signatories and their sublessees, assignees, transferees, successors, and/or their duly authorized representatives and the like, the Landlord Companies placed themselves in such a relationship with the Servicemembers that the law imposes an obligation upon the Landlord Companies to act in such a way that the Servicemember Plaintiffs would not be injured as a result of leasing the privatized housing units.

76.     The Underlying Contracts require compliance with applicable state laws. As revealed by congressional testimony in December of 2019 by Elizabeth A. Field, a Director with the Government Accountability Office, the Landlord Companies must "comply with all federal,

---

[5] *See* Office of the Assistant Secretary of Defense for Sustainment, Facilities Management–Military Housing Privatization Initiative, *available at* https://www.acq.osd.mil/eie/FIM/Housing/Housing_index.html.
[6] The Underlying Contracts bind the lessee signatories and also their sublessees, assignees, transferees, successors and/or their duly authorized representatives and the like.

state, and local environmental health and safety codes. . . . [T]hat requirement is in all of the contracts."[7]

77.    Upon information and belief, the Underlying Contracts require management and maintenance of the military housing consistent with the standards of a market rate residential rental development in the surrounding area. This includes maintenance and repair in accordance with military, federal, state, and local codes to ensure all the houses are maintained in a reasonably acceptable fashion at all times.

78.    In addition, all new construction and major renovations at military housing projects must be completed in accordance with local building codes and standards.

79.    Moreover, the military services have adopted their own standards applying to the condition and maintenance of privatized housing. Compliance with the standards is generally mandatory. For example, Army Pamphlet 420-1-1 identifies standards intended to maintain housing to prevent its deterioration including, without limitation, as follows: roofing is required to be weather-tight and free of corrosion and abnormal deterioration of individual components, and replacement is required for missing pieces to preserve the original whole condition of the roof system; items which pierce the roofing must function as originally designed; flashing must prevent leaks as originally intended; interior walls must be free of damage, deterioration, cracks or defective materials; subflooring and related structural members must be safe and usable; deteriorated subflooring must be repaired or replaced to retain the original condition of the floor; and interior trim must be smooth and free of chipped and peeling paint.[8]

---

[7] *See* Transcript of December 3, 2019 Hearing Before the Committee on Armed Services of the United States Senate, *available at* https://www.armed-services.senate.gov/imo/media/doc/19-77_12-03-19.pdf, at p. 89:7-10.
[8] *See* Army Pamphlet 420-1-1, pp. 49-51, *available at* https://armypubs.army.mil/epubs/DR_pubs/ DR_a/pdf/web/PAM%20420-1-1.pdf.

80.     Similarly, pursuant to the Air Force Guidance Memorandum AFI32-6001, maintenance and repair must be performed according to accepted engineering practices and repairs to defective, broken, damaged, or malfunctioning conditions must be performed timely and adequately. This includes, without limitation, interior painting; minor floor and wall repairs; restoring ceiling and wall finishes; electrical and plumbing fixture repairs; restoration or replacement of flooring and roofing systems as needed; repair of exterior walls and structures; repair of interior partitions; repair of electrical, plumbing, heating ventilations and air conditioning; and replacing failed or unserviceable materials, systems or components.[9] Under the U.S. Air Force Family Housing Guide for Planning, Programming, Design, and Construction, lead-based paint must be abated and indoor air pollutants such as mold, asbestos and harmful allergens must be eliminated.[10]

81.     Upon information and belief, the Underlying Contracts require the Landlord Companies to manage lead-based paint in accordance with standards set by the military services, and an environmental baseline survey must be prepared before any real property can be sold, leased, transferred, or acquired so as to establish a baseline of the environmental condition of the housing and serve as a basis for identifying areas that may be contaminated. Upon information and belief, the survey includes a lead-based paint survey indicating the presence of lead-based paint in the housing units constructed prior to 1978, and in some instances in the soil surrounding the units which exceeds regulations set by the Environmental Protection Agency ("EPA"). Pursuant to EPA regulations, a soil-lead hazard is present on residential property when concentrations in the soil exceed 400 parts per million in high contact areas for children or 1,200 parts per million of bare

---

[9] *See* Air Force Guidance Memorandum AFI32-6001, pp. 57-58, *available at* https://www.wbdg.org/FFC/AF/AFI/afi_32_6001.pdf.
[10] *See* U.S. Air Force Family Housing Guide for Planning, Programming, Design and Construction, pp. 211-14, *available at* https://www.wbdg.org/FFC/AF/AFDG/familyhousing.pdf.

soil in the rest of the yard. According to the baseline survey, lead-based paint exists throughout the housing units, including, without limitation, door frames, window sills, window jambs, and baseboards. Upon information and belief, the Landlord Companies possessed records and information, including the aforementioned environmental survey, which identified concerning lead concentrations in the soil surrounding the housing units, as well as in the lead-based paint present in the housing units, but did not disclose such information to all tenants as required and have failed to remedy the conditions, thereby exposing the Servicemembers and their families thereto.

82.    Upon information and belief, the Landlord Companies knew about the unacceptable conditions in the housing when they agreed in the Underlying Contracts to manage the housing and ensure it was made habitable and acceptable for military members and their families to live in the houses. Upon information and belief, the Landlord Companies agreed they would not permit occupancy or use of any buildings, including those leased by the Servicemembers, without complying with all applicable federal, state, and local laws and regulations pertaining to lead-based paint and lead based paint hazards.

83.    The Landlord Companies require Servicemembers to enter into a lease agreement. Under the terms of the lease, Servicemembers' rent is the full BAH, which is deposited directly into the Landlord Companies' accounts. Despite the deplorable conditions described herein, there is no ability for Servicemembers to negotiate the price of the housing.

84.    When a servicemember receives orders moving them to a new base, the main priority is to start the new assignment as expeditiously as possible. This is particularly challenging for servicemembers who serve as part of high operations-tempo units vital to national security or those who need to quickly integrate into pre-deployment training. And for servicemembers

relocating across the country or from overseas, there is often little or no time to meaningfully review housing options at the new duty station before arriving on base.

85.     To this point, Senator Tim Kaine remarked on December 3, 2019 during the hearing before the United States Senate's Armed Services Committee:

> But **they treat military tenants like they are captives**, like it is a captive audience. People who move from across the country to a place where they do not know anyone, where they do not know anything about the rental market, where they are trying to find new schools and get accustomed to everything else – there is a natural tendency to want to live on base. And the occupancy rates will be high because of that tendency. And **so these companies who would compete hard and try to produce a high quality product in another business** unit of the identical company **treat these folks as if they are captives** and that they do not have to treat them in the same way that they would treat private tenants. And I find that outrageous.

*See* STATEMENT BEFORE SENATE ARMED SERVICES COMMITTEE (emphasis added).

86.     The lease is made subject to the laws of the State of Texas, and the Landlord Companies provide servicemembers with resident guide(s) incorporated into the lease which upon information and belief convey rules and regulations subject to the laws of the State of Texas.

87.     Upon information and belief, the Landlord Companies have received thousands of complaints and repair requests, including those from the Servicemembers Plaintiffs, evidencing serious defects that exist throughout the housing units. The Landlord Companies had actual notice of the unfit and uninhabitable state of leased premises but failed to adequately make repairs.

88.     Instead, upon information and belief, the Landlord Companies made representations to the Servicemembers in connection with the lease, including that the houses were structurally sound, had no potential health or safety hazards to residents, and were compatible with contemporary standards of livability. Upon information and belief, the Landlord Companies advertised that current renovations are compliant with current housing and building codes.

89.     The fact remains that the Servicemembers' experiences run overwhelmingly contrary to the Landlord Companies' false representations.

## VI.     CAUSES OF ACTION

90.     The Servicemembers reallege and incorporate by reference the foregoing paragraphs as though fully stated herein.

## Count 1 – Breach of Contract

91.     The Servicemembers assert claims against the Landlord Companies for breach of the particular lease agreement ("Lease") to which the Landlord Companies and each of the Servicemembers are parties.

92.     Pursuant to Texas law, implicit in the Lease, and/or as expressly represented therein, is the warranty that the Landlord Companies were leasing houses to Servicemembers which were fit for human habitation and not replete with deplorable living conditions (including, without limitation, leaking pipes; seeping sewage; excessive moisture; repulsive rodent and insect infestations; and systemically-poor maintenance) and appalling defects (including, without limitation, the presence of structurally-deficient flooring and walls; faulty insulation; pervasive mold and other toxins; inescapable contamination due to the presence of asbestos and lead-based paint; deficient electrical, plumbing and HVAC systems; and other unacceptable departures from applicable building and housing codes).

93.     To date, the Landlord Companies have failed to comply with the material terms of each Lease by failing to ensure the houses were fit for human habitation and by failing to diligently repair and remedy the conditions affecting habitation at the premises as set forth above in more detail. As such, the Landlord Companies have materially breached their leases with the Servicemembers, causing them to suffer actual damages.

94.     Because of the Landlord Companies' breaches, the Servicemembers seek to recover from the Landlord Companies, jointly and severally, all actual damages, economic damages incurred in the past, economic damages to be incurred in the future, and attorneys' fees and costs pursuant to Section 38.001 of the Texas Civil Practice and Remedies Code.

## Count 2 – Deceptive Trade Practices

95.     Pleading further, and in the alternative to the extent necessary, the Servicemembers are consumers as defined by the Deceptive Trade Practices Act ("DTPA"), as they sought to acquire goods and services by lease—namely a habitable and properly-maintained residence from the Landlord Companies. The Landlord Companies are proper defendants under the DTPA.

96.     Each of the named Defendants, in the course of leasing residences to the Servicemembers, violated the DTPA in multiple respects, including without limitation: (i) breaching the implied warranty of habitability;[11] (ii) engaging in an unconscionable course of action; and (iii) using false, misleading, and deceptive practices, including:

>   a.      Causing confusion or misunderstanding about affiliation, connection, or association with, or certification by, another;
>
>   b.      Causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
>
>   c.      Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not;
>
>   d.      Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

---

[11] The Texas Supreme Court has recognized that, in a residential lease, the landlord impliedly warrants that the property is habitable and fit for human living as of the beginning of the lease and that such condition will remain in effect throughout the lease. *Kamarath v. Bennett*, 568 S.W.2d 658, 660-61 (Tex. 1978).

e.    Representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;

f.    Knowingly making false or misleading statements of fact concerning the need for parts, replacement, or repair service;

g.    Representing that a guarantee or warranty confers or involves rights or remedies which it does not have or involve;

h.    Representing that work or services have been performed on, or parts replaced in, goods when the work or services were not performed or the parts replaced; and

i.    Failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.[12]

97.    Each of the Defendants, by virtue of their course of administering, leasing, building, and repairing the housing units at issue, were uniquely aware of the condition of the houses, including, without limitation, the existence of mold, asbestos, rodent and/or insect infestations, and the electrical, plumbing, and HVAC issues associated with the housing units they manage. Nevertheless, the Defendants knowingly and intentionally leased houses to the Servicemembers, necessarily and as a matter of fact representing to the Servicemembers that the houses were habitable and that appropriate repair and remedy work had been undertaken in the past and would be undertaken in the future.

98.    The Defendants' knowing and intentional representations to the Servicemembers were materially false and misleading. The Servicemembers relied to their detriment on the representations of the Defendants in entering into the leases. T he Servicemembers have discovered the houses were uninhabitable and not safe for human occupancy and have suffered

---

[12] *See* Tex. Bus. & Com. Code §§ 17.46(b)(2), (3), (5), (7), (12), (13), (20), (22), (24).

medical issues as a result of occupying the houses. The Servicemembers have further discovered the Defendants misled them into believing the houses had been properly maintained, and that the repair and remedy work that the Servicemembers requested during their tenancy was undertaken by qualified professionals and performed in a good and workmanlike manner, so as to fully remedy the complained-of issues. Had the Servicemembers had an opportunity to properly inspect the houses leased to them, and had the Defendants disclosed the true nature of the damage to the houses, none of the Servicemembers would have entered into the respective Leases.

99.    The Defendants also misrepresented and caused confusion about the source, sponsorship, approval, and/or certification of goods or services. One way the Defendants did this was through knowingly and intentionally misleading the Servicemembers into believing, through their email signature lines, that their own employees are part of the Department of Defense or are otherwise overtly affiliated with and/or acting under the immediate direction of the military.

100.    In reality, each of the houses leased to the Servicemembers suffers from such extreme deterioration and mold-related damage and infestation, such that the houses are not safe for human habitation. Mold pervades and grows in the houses. The moisture content of walls contributes to the ever-present moldy conditions, and without repair will only continue to get worse. HVAC systems leak as well and flood the houses. Rodents and insects pervade the walls and, in many cases, the living spaces. In short, the Landlord Companies knowingly and intentionally leased the Servicemembers houses which were uninhabitable from the inception of the lease and the Landlord Companies subsequently refused to perform reasonable repairs to address the issues and make the houses fit for human habitation.

101.    Moreover, the Landlord Companies have utilized their relationship with the military, the Servicemembers' status within the military, the Servicemembers' relatively weaker

economic position, the availability (or sometimes lack thereof) of military benefits associated with moving, and the good schools associated with living on military bases to effectively hold the Servicemembers hostage in their leases until they received orders stationing them elsewhere. Meanwhile, the Landlord Companies obtained the full amount of Servicemembers' BAH directly from the federal government, giving the Servicemembers no discount for the size, quality, or condition of their house, nor for the substandard and deceptive performance of periodic and requested maintenance.

102.    The Defendants' above-described knowing and intentional conduct in subjecting the Servicemembers to uninhabitable living conditions has been and remains a producing cause of economic damages, including, without limitation, loss of base housing allowance, damage to personal property, repair bills, excessive utility bills, medical bills, and future medical bills. Moreover, each of the Servicemembers and their families have suffered mental anguish damages as a result of the Landlord Companies' conduct in knowingly and intentionally placing them in uninhabitable housing units, with such mental anguish many times manifesting itself in physical symptoms associated with the conditions in which the Servicemembers were forced to live. The Servicemembers have also suffered mental anguish through concerns about their families' wellbeing (as well as their own), their concerns about how and whether they could afford to escape those conditions, concerns about finding suitable housing, concerns about replacing personal property, stress caused by the constant relocation from one temporary residential placement to another, and sorrow over the loss of priceless and/or irreplaceable family heirlooms and records.

103.    The Defendants' knowing and intentional acts and/or omissions as described herein were committed with actual awareness of the falsity, deception, and/or unfairness of an act or practice, or of a condition or defect that constitutes a breach of warranty, and with the specific

intent of having the Servicemembers act in detrimental reliance on the falsity or deception or in detrimental ignorance of the unfairness.

104.    As a result of the Defendants' conduct, the Servicemembers seek to recover from the Defendants, jointly and severally, all actual damages, economic damages incurred in the past, economic damages for medical treatments to be incurred in the future, mental anguish damages, treble damages, and attorneys' fees and costs as authorized by section 17.50 of the DTPA.

**Count 3 – Breach of Implied Warranty of Habitability, Breach of Implied Warranty of Good and Workmanlike Repairs, and <u>Violations of Section 92.051 *et seq.* of the Texas Property Code</u>**

105.    Pleading further, and in the alternative to the extent necessary, the Servicemembers assert claims against the Landlord Companies for breaching the implied warranties of habitability and good and workmanlike repairs, and for violating the Texas Property Code, including but not limited to section 92.051 *et seq.* The Servicemembers have, in accordance with their leases and Chapter 92 of the Texas Property Code, given the Landlord Companies notice of the myriad of issues identified herein that are associated with the houses each family has leased from the Landlord Companies. Nevertheless, the Landlord Companies knowingly and intentionally failed to repair defects (and/or to make such repairs in a good and workmanlike manner) and to make each house habitable for human occupation. To date, the housing units leased by the Servicemembers suffer from pervasive mold and other conditions which materially affect the health and safety of occupants. The Landlord Companies have had adequate time to repair and/or remedy the unsafe and unsanitary conditions after the Servicemembers' notices but have knowingly and intentionally failed to make a diligent effort to repair or remedy the conditions after receiving notice from the Servicemembers.

106.    Moreover, unique to the fact that the Landlord Companies are in the business of leasing to members of the military, obtaining rent payments directly from the federal government and providing housing on a base affiliated with good schools, the Landlord Companies have effectively deprived the Servicemembers of potential remedies, including, without limitation, withholding rent and performing repairs themselves, or terminating their respective leases and moving to suitable housing. The Landlord Companies hold the Servicemembers hostage—and the Landlord Companies know it.

107.    The Landlord Companies' conduct violates section 92.051 *et seq.* of the Texas Property Code and has further deprived the Servicemembers of remedies that are statutorily prescribed. The Landlord Companies' conduct further violates the implied warranty of habitability and the implied warranty of good and workmanlike repairs. As a result, the Servicemembers seek to recover from the Landlord Companies, jointly and severally, all actual damages, economic damages incurred in the past, economic damages to be incurred in the future, statutory damages, and attorneys' fees and costs as authorized by Sections 92.056 and 92.0563 of the Texas Property Code.

### Count 4 – Negligence, Negligent Misrepresentation, and Gross Negligence

108.    Pleading further, and in the alternative to the extent necessary, the Servicemembers allege the Landlord Companies leased homes to Servicemembers with the above-described hazardous and deplorable conditions—but the Landlord Companies never notified the Servicemembers of such conditions. The Landlord Companies were aware that the houses had such persistent and toxic defects, as prior tenants had made them aware of the hazards on numerous occasions. After the Servicemembers moved into their homes and ultimately discovered the issues, they complained repeatedly to the Landlord Companies. But the Landlord Companies refused to

act to properly remediate or abate the problems despite knowledge that their failure to act would only exacerbate the problems. When the Landlord Companies did act, they made only token repairs or permitted only token repairs to be made that did not eradicate the problem, resulting in continuing harm. In the course of making token repairs, the Landlord Companies failed to exercise the level of care ordinarily exercised by persons making such repairs.

109.    The Landlord Companies, as specialized landlords in the business of privatized military housing, owed Servicemembers a duty to notify them of known problems with the housing, provide them with habitable living conditions in the houses leased to them, and to properly maintain and repair the houses to a standard fit for human habitation. The Landlord Companies' conduct fell far below the applicable standard of care owed to the Servicemembers. The Landlord Companies' breaches of their duty include, without limitation, failing to notify the Servicemembers of known hazardous and deplorable conditions, failing to properly evaluate housing conditions to ensure leased properties were fit for human habitation, and failing to properly repair and remedy those conditions affecting human health and safety.

110.    Moreover, the Landlord Companies, with specialized knowledge regarding the business of military tenancies and the properties leased to Servicemembers, and with a significant pecuniary interest in leasing houses to military families, falsely represented to the Servicemembers that their houses were safe and fit for human habitation and were and would continue to be properly maintained, without exercising reasonable diligence in ascertaining whether the housing units were habitable and the representations were accurate. The Servicemembers—who were neither given a meaningful opportunity to inspect the units leased to them, nor provided with the truth regarding the habitability of those units prior to signing leases on them—justifiably relied on the misrepresentations of the Landlord Companies to their detriment.

111.    The Landlord Companies engaged in the above-described acts and/or omissions with gross negligence, such that their acts or omissions, when viewed objectively from the Landlord Companies' standpoint at the time they occurred, involved an extreme degree of risk considering the probability and magnitude of the potential harm. Further, the Landlord Companies at all times relevant, had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of the Servicemembers and their families when they knew such acts and/or omissions would clearly and unquestionably result in dangerous health conditions and serious injury to their tenants, as well as destruction of their property. The Landlord Companies' concealment of the persistent and toxic conditions and their refusal to remediate the conditions were among the Landlord Companies' acts and/or omissions which constituted gross negligence.

112.    As a proximate cause of the Landlord Companies' conduct, the Servicemembers have incurred and seek to recover from the Landlord Companies, jointly and severally, all actual damages, economic damages incurred in the past, economic damages to be incurred in the future, and exemplary damages for the Landlord Companies' gross negligence pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code.

## **Count 5 – Statutory Fraud in a Real Estate Transaction**

113.    Pleading further, and in the alternative to the extent necessary, the Servicemembers allege statutory fraud. Pursuant to Section 27.01 of the Texas Business and Commerce Code, fraud in a transaction involving real estate consists of a false representation of past or existing material fact when the representation is made to a person to induce them to enter into a contract and relied on by that person in entering into that contract. Furthermore, fraud in a transaction involving real estate consists of a false promise to do an act when it is material, made with the intention of not

fulfilling it, made to induce a person to enter into a contract, and relied upon by another in entering into that contract.

114.    The Servicemembers and the Landlord Companies clearly entered into leases, which are transactions involving real estate. In the course of those transactions, each of the Defendants represented to the Servicemembers that the houses being leased to them were safe for human habitation and that the Landlord Companies would perform repair and remedy work to keep the houses habitable throughout the term of the leases. The Defendants made these false representations to the Servicemembers fraudulently and/or maliciously so as to induce them to sign leases (including discussing repairs and remedies in documents associated with the Leases) and profit therefrom, and the Servicemembers justifiably relied upon those representations and promises because of the nature of the association between the military and the Landlord Companies, which exclusively control the leasing of on-base housing.

115.    However, because the houses managed and leased by the Defendants suffer from pervasive mold and other conditions which have purportedly been "repaired" to no avail for years, it is readily apparent that the Defendants were aware that their representations that the houses were fit for human habitation were false and that their litany of promises to perform future repairs and to make the houses habitable were made without any intention of fulfilling those promises.

116.    As a result, the Servicemembers suffered damages. They seek to recover from the Defendants, jointly and severally, all actual damages, economic damages incurred in the past, economic damages to be incurred in the future, and attorneys' fees and costs pursuant to Chapter 27 of the Texas Business and Commerce Code. Servicemembers further seek to recover exemplary damages in accordance with Chapter 41 of the Texas Civil Practice and Remedies Code because Servicemembers' damages arose from the Landlord Companies' fraud and/or malice.

## Count 6 – Common Law Fraud

117.    Pleading further, and in the alternative to the extent necessary, the Servicemembers allege common law fraud. As described herein, each of the Defendants made multiple material omissions regarding the condition of the houses, and multiple material misrepresentations regarding the habitability of the units. The Defendants also made material representations that repair work would be completed and/or had been completed, and that as a result, the units had become habitable and the problems had been resolved. The Defendants were aware that all of their omissions of fact concerning the condition of the units were material when they presented the Servicemembers with leases, and the Defendants—because of the ongoing condition issues, repair and remedy of the same problem, and pervasive mold reporting—knew their representations regarding the habitability of the houses were false and/or misleading. Despite knowing the falsity, the Landlord Companies and their agents made these representations intentionally or, at the very least, recklessly, as positive assertions and without knowledge of their truth.

118.    The Defendants intentionally omitted information and made the foregoing misrepresentations with the intent that the Servicemembers would rely on them and enter into leases, and, in fact, the Servicemembers did rely thereon to their detriment. The Servicemembers' reliance was justified given their lack of an ability to inspect the houses and given the Landlord Companies' power over the market. This conduct caused injury to the Servicemembers, including but not limited to paying rent for uninhabitable houses, excessive utility bills, environmental testing, moving and storage expenses, expenses for replacement of furniture and other items of personal property, and medical expenses in the past and to be incurred in the future.

119.    As a result of the Defendants' conduct, the Servicemembers seek to recover from the Defendants, jointly and severally, all actual damages, economic damages incurred in the past,

economic damages to be incurred in the future, mental anguish damages, and exemplary damages in accordance with Chapter 41 of the Texas Civil Practice and Remedies Code, as the Servicemembers' damages arose from the Landlord Companies' fraud and/or malice.

### Count 7 – Unjust Enrichment / Restitution / Money Had and Received

120.    Pleading further, and in the alternative to the extent necessary, the Servicemembers allege that, through the transactions described herein, the Landlord Companies were in the business of and were on notice that the Servicemembers intended to lease from them habitable housing on the Military Installation(s). The Landlord Companies, through their conduct in leasing the Servicemembers substandard housing that the Landlord Companies failed to maintain in exchange for the Servicemembers' BAH, have been unjustly enriched and have received money from the Servicemembers that, in equity and good conscience, belongs to the Servicemembers and for which restitution is justly owed.

### Count 8 – Third-Party Beneficiary of Contract

121.    Pleading further, and in the alternative to the extent necessary, the Servicemembers allege the Landlord Companies are bound by the Underlying Contracts entered into with The United States of America.[13] The Underlying Contracts constitute valid and enforceable contracts.

122.    The Servicemembers were the intended beneficiaries of the Underlying Contracts including, without limitation, requirements in the applicable ground leases that the Landlord Companies ensure professional management and maintenance of the military housing neighborhoods consistent with the standard of a market rate residential lease development in the local area.

---

[13] The Underlying Contracts bind the lessee signatories and also their sublessees, assignees, transferees, successors and/or their duly authorized representatives and the like.

123.    The Landlord Companies' obligations, which were included in the Underlying Contracts, were intended to ensure military personnel, such as the Servicemembers Plaintiffs (and their families), would be provided with safe and habitable housing while the Landlord Companies operated the housing at issue. Recognition of the Servicemembers' right to performance is appropriate to effectuate the intention of the Underlying Contracts. Circumstances indicate that the parties to the Underlying Contracts, including the Landlord Companies, intended to benefit military personnel, including the Servicemembers.

124.    The Landlord Companies breached the requirements of the Underlying Contracts by engaging in conduct including, but not limited to, failure to ensure professional management and maintenance of the military housing neighborhoods consistent with the standard of a market rate residential rental development in the local area.

125.    The Landlord Companies also breached the requirements of the Underlying Contracts by engaging in conduct including but not limited to failing to adhere to federal, state, and local lead-based paint regulations as required by the Underlying Contracts, and also by failing to comply with requirements in the Underlying Contracts by engaging in the aforesaid particulars.

126.    The Landlord Companies' conduct also breached the duty of good faith and fair dealing implied in the Underlying Contracts.

127.    As a direct, proximate, and foreseeable result of the Landlord Companies' breaches of the Underlying Contracts, the Servicemembers, as intended, direct, third-party beneficiaries of such contracts, sustained damages. They are entitled to recover from the Landlord Companies, jointly and severally, all actual damages, economic damages incurred in the past, economic damages to be incurred in the future.

## Count 9 – Intentional Nuisance

128.    Pleading further, and in the alternative to the extent necessary, the Servicemembers assert claims against the Landlord Companies for intentional nuisance. As described herein, the Landlord Companies refused to act to maintain houses at the Military Installation(s) with the knowledge that their inaction would result in dangerous living conditions, or that their inaction was substantially certain to result in dangerous living conditions, thereby interfering with the Servicemembers' use and enjoyment of their leased homes.

129.    Such interference with the Servicemembers' enjoyment of their homes was substantial, causing physical damage to their personal property, harm to their health, and psychological harm to their "peace of mind" in the use and enjoyment of their homes.

130.    The effect of such substantial interference in the Servicemembers' enjoyment of their property was unreasonable. The Landlord Companies created conditions that resulted in offensive and intolerable living environments that endangered the Servicemembers' health and property.

131.    As a result of said conduct, the Servicemembers seek to recover from and against the Landlord Companies, jointly and severally, all actual damages, exemplary damages, and costs and fees.

## Count 10 – Negligent Nuisance

132.    Pleading further, and in the alternative to the extent necessary, the Servicemembers assert claims against the Landlord Companies for negligent nuisance. As described herein, the Landlord Companies negligently failed to act when they owed the Servicemembers a duty, as landlord and remediator, to act, resulting in an unreasonable interference with the Servicemembers' enjoyment of their homes.

133.     The Landlord Companies failed to take precautions against the risk that dangerous living conditions would result from their inaction or substandard action when they had the ability to control the repairs on the houses and abate such dangers.

134.     As a result of such conduct, the Servicemembers seek to recover from the Landlord Companies, jointly and severally, all actual damages, exemplary damages, and costs and fees.

## Count 11 – Strict Liability Nuisance

135.     Pleading further, and in the alternative to the extent necessary, the Servicemembers assert claims against the Landlord Companies for strict liability nuisance. As described herein, the Landlord Companies' conduct violates Sections 341.011 and 343.011 of the Texas Health and Safety Code.

136.     For example, under Section 341.011, the following are statutory public health nuisances: "sewage, human excreta, wastewater, garbage, or other organic wastes deposited, stored, discharged, or exposed in such a way as to be a potential instrument or medium in disease transmission to a person or between persons," "a collection of water that is a breeding area for mosquitoes that can transmit diseases," "a place or condition harboring rats in a populous area," and "an object, place, or condition that is a possible and probable medium of disease transmission to or between humans." *See* TEX. HEALTH & SAFETY CODE §§ 341.011(5), (7), (9), and (12).

137.     Despite being notified of such conditions, Defendants' failure to act has resulted in the above-described statutory violations. A person who causes, suffers, allows, or permits a violation under Section 341.011 shall be assessed a civil penalty of not less than $50 and not more than $5,000 for each violation.

138.    Under Section 343.011, "a person may not cause, permit, or allow a public nuisance," which the statute defines as, among other things, "maintaining premises in a manner that creates an unsanitary condition likely to attract or harbor mosquitoes, rodents, vermin, or other disease-carrying pests" and "maintaining a building in a manner that is structurally unsafe or constitutes a hazard to safety, health, or public welfare." *See* TEX. HEALTH & SAFETY CODE §§ 343.011(b), (c)(3), (c)(5).

139.    As a result of Defendants' conduct, Plaintiffs seek to recover from each Defendant, jointly and severally, all actual damages, exemplary  damages, and costs and fees.

## VII.    ACCRUAL OF CLAIMS/DISCOVERY OF INJURIES

140.    Each of the Servicemembers began suffering injuries within the limitations period for all of the claims asserted herein. Specifically, they all began suffering medical conditions and suffered property damage at points in time after they moved into their applicable military housing units.

141.    Further, pleading in the alternative to the extent necessary, all Servicemembers are entitled to tolling of their claims on account of the Landlord Companies' fraudulent concealment. The Servicemembers had to rely on the Landlord Companies to perform maintenance and repairs. After each repair, the Servicemembers reasonably believed (in reliance upon the Landlord Companies' assurances) that the problems were remedied, or that there were no problems at all, when in reality the Landlord Companies had just hidden the problems. Only later did many of the Servicemembers discover that the Landlord Companies' so-called "repairs" were nothing but band-aid measures and that their health and/or property were imperiled.

142.    Further, pleading in the alternative to the extent necessary, the discovery rule tolls Servicemembers' claims. *See, e.g.*, Tex. Bus. & Com. Code § 17.565. All Servicemembers

discovered the extent and true nature of their personal property damage only upon moving out. Additionally, under Texas law the discovery rule tolls mold-related personal injury claims until after onset of mold-related illness and until the plaintiff discovers the extent of mold and causally links it to ill health, which for all Servicemembers occurred well within the limitations period. Thus, accrual of the Servicemembers' claims occurred, at earliest, only after: (1) discovery of extent of the mold; (2) symptomatic manifestation of ill health; and (3) discovery of a causal connection between (1) and (2).

## VIII.    CONDITIONS PRECEDENT

143.    All conditions precedent to the Servicemembers' recovery have occurred or have been waived, excused, or otherwise satisfied. All required notices have been provided or were waived, excused, or otherwise satisfied.

## IX.    PRE-JUDGMENT AND POST-JUDGMENT INTEREST

144.    Plaintiffs seek pre-judgment and post-judgment interest at the maximum legal rate.

## X.    ATTORNEYS' FEES & COSTS

145.    Pursuant to all applicable statutory provisions pled herein, including, without limitation, Section 38.001 of the Texas Civil Practice and Remedies Code, Section 27.01 of the Texas Business and Commerce Code, Chapter 92 of the Texas Property Code, Section 17.50(d) of the Texas Business and Commerce Code, and as otherwise allowed at law and/or in equity, the Servicemembers are entitled to recover from the Landlord Companies all of their reasonable and necessary attorneys' fees and expenses incurred in connection with this lawsuit. The Servicemembers are also entitled to recover from the Landlord Companies all costs of court.

## XI.    EXEMPLARY DAMAGES

146.    Pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code, because the injury suffered by the Servicemembers resulted from the fraud, malice, and/or gross negligence of the Landlord Companies, the Servicemembers are entitled to and seek the recovery of exemplary damages from the Landlord Companies.

## XII.    JOINT LIABILITY

147.    The Landlord Companies are jointly and severally liable to the Servicemembers on all causes of action asserted herein for a multitude of reasons.

148.    First, the Landlord Companies had a meeting of the minds and embarked on a systematic attempt to defraud Servicemembers by making false representations and promises to Servicemembers in order to induce them to lease with the Landlord Companies, without any legitimate expectation that they would provide Servicemembers with a habitable home as promised. The Landlord Companies engaged in one or more unlawful, overt acts to accomplish the actions complained of herein. Therefore, all the Landlord Companies are jointly and severally liable for the claims asserted against each of them.

149.    Second, the Landlord Companies are part of a joint enterprise or single business enterprise associated with the rental of houses at military installations in Texas and are not individually distinguishable. All the Landlord Companies carried on business as a mutual undertaking with a common business or pecuniary purpose and using the same common name, which is featured prominently on Servicemembers' leases and on websites designed for communication between Servicemembers and the Landlord Companies. The Landlord Companies had an express or implied agreement for a common purpose to be carried out by their enterprise, had a community of pecuniary interest, and each had an equal right to direct and control the

enterprise. Therefore, all the Landlord Companies were engaged in a single, joint enterprise and each of them is jointly and severally liable for the claims asserted against each of them.

150.    Third, the Landlord Companies intentionally conferred authority on one another to act on their behalf, intentionally allowed one another to believe they had authority to act on behalf of one another, and/or by lack of care, allowed one another to believe they had authority to act on behalf of one another. Specifically, in all or nearly all email communications between Servicemembers and the Landlord Companies, the parties communicating on behalf of the Landlord Companies have signature blocks, among other indications, clearly stated that they were being transmitted by as part of an affiliation/agency with each other. As a result, all the Landlord Companies acted as the agent of the others in the course of the conduct described herein. Therefore, all the Landlord Companies are jointly and severally liable as principals/agents for the claims asserted against each of them.

151.    Fourth, the Landlord Companies committed the acts complained of herein on behalf of one another and ratified the same. Each of the Landlord Companies approved these acts by word, act, and/or conduct after acquiring full knowledge of these acts, including accepting money from Servicemembers. This approval was given with the intention of giving validity to the acts. Therefore, all the Landlord Companies are jointly and severally liable for the claims asserted against each of them.

152.    Fifth, a person who knowingly aids and abets and/or participates in a breach of duty or fraudulent conduct is liable as a joint tortfeasor. All the Landlord Companies aided and abetted, participated in, and induced each other to make fraudulent representations and promises to Servicemembers and to breach their duties as set forth herein. Each of the Landlord Companies

did so knowingly and benefitted from such conduct. Therefore, each is jointly and severally liable for the same.

<h2 align="center">XIII.        JURY DEMAND</h2>

153.    Plaintiffs demand a trial by jury and have tendered the requisite fee.

<h2 align="center">CONCLUSION AND PRAYER</h2>

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants be cited to appear and answer herein, that this cause be set down for trial before a jury, and that Plaintiffs recover judgment of and from Defendants for actual, special, incidental, and consequential damages, as pled herein, in such an amount as the evidence shows and the jury determines to be proper, together with pre-judgment and post-judgment interest, costs of suit, and such other and further relief to which Plaintiffs may show themselves to be justly entitled, whether at law or in equity.

Respectfully submitted,

By: */s/ Ryan C. Reed*
**PULMAN LEFLORE PULLEN & REED LLP**
2161 NW Military Hwy, Ste. 400
San Antonio, Texas  78213
Telephone: (210) 222-9494
Facsimile: (210) 892-1610
RYAN C. REED
State Bar No. 24065957
rreed@pulmanlaw.com
CAROLINE E. HENRY
State Bar No. 24137320
chenry@pulmanlaw.com

**GUERRA LLP**
875 East Ashby Place
Suite 1200
San Antonio, Texas 78212
Telephone: (210) 447-0500

Facsimile: (210) 447-0501
FRANCISCO GUERRA, IV.
State Bar No. 00796684
fguerra@guerrallp.com
ROBERT BRZEZINSKI
State Bar No. 00783746
rbrzezinski@guerrallp.com
JENNIFER NEAL
State Bar No. 24089834
jneal@guerrallp.com
BAILEY E. VANNATTA
State Bar No. 24119113
bvannatta@guerrallp.com
JULIE A. MATSEN
State Bar No. 24115654
jmatsen@guerrallp.com


**LAW OFFICES OF JAMES R. MORIARTY**
4119 Montrose, Suite 250
Houston, Texas 77006
Telephone: (713) 528-0700
Facsimile: (713) 528-1390
JAMES. R. MORIARTY
State Bar No. 14459000
jim@moriarty.com


**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 3, 2025, a true and correct copy of Plaintiffs' First Amended Petition was served on counsel of record, as follows:

Joelle G. Nelson                              Via Email: Joelle.Nelson@lewisbrisbois.com
**LEWIS BRISBOIS BISGAARD & SMITH LLP**
24 Greenway Plaza, Suite 1400
Houston, Texas 77046

Michelle R. Gilboe                          Via Email: Michelle.Gilboe@lewisbrisbois.com
Elena D. Harvey                             Via Email:  Elena.Harvey@lewisbrisbois.com
**LEWIS BRISBOIS BISGAARD & SMITH LLP**
Wells Fargo Center
90 South 7th Street, Suite 2800
Minneapolis, Minnesota 55402

> */s/ Ryan C. Reed*
> Ryan C. Reed